UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
SALLY DANKAS,

                              Plaintiff,                    COMPLAINT
              -against -                                    *Jury Trial Demanded*

CARTODB, INC. a/k/a CARTO,

                              Defendant.
---------------------------------------------------------x

PLAINTIFF SALLY DANKAS, by her attorney Goddard Law PLLC, whose offices are located at 39 Broadway, Suite 1540, New York, NY 10006, alleges upon knowledge with respect to herself, and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1.      This is a civil action brought on behalf of Plaintiff Sally Dankas (hereinafter "Plaintiff") against Defendant CartoDB, Inc. a/k/a Carto (hereinafter "Defendant"), for gender discrimination and retaliation in violation of Title VII, the New York Executive Law, and the New York City Administrative Code together with any and all other causes of action which can be reasonably inferred from the facts as set forth below.

## JURISDICTION AND VENUE

2.      This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form a part of the same case or controversy between Plaintiff and Defendant.

3.      Venue is proper in this case pursuant to 28 U.S.C. § 1391 because a substantial part of the events which give rise to Plaintiff's claims took place in Kings County, New York, which is in the Eastern District of New York.

## THE PARTIES

4.      Plaintiff is a female citizen of the United States who at all times relevant to this charge resided in Kings County, New York.

5.      Plaintiff is and was, at all times relevant herein, Defendant's "employee" within the meaning of all relevant Federal, State and local laws including, but not limited to, Title VII.

6.      Upon information and belief, at all times herein, Defendant was and is a corporation permitted to do business in New York. Upon information and belief, Defendant's United States headquarters are located at 201 Moore Street, Brooklyn, NY 11206.

7.      Defendant is and was, at all times relevant herein, Plaintiff's "employer" within the meaning of all relevant Federal, State and Local laws, including but not limited to Title VII.

## CONDITIONS PRECEDENT

8.      Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about June 1, 2018.

9.      On or about October 10, 2018, Plaintiff received a Notice of Right to Sue from the EEOC.

## FACTUAL ALLEGATIONS

### Plaintiff is Hired by Defendant Based on her Exceptional Experience

10.     Plaintiff is an experienced Human Resources and Operations Manager with many years of Global Tech Experience. Prior to joining Defendant, Plaintiff had been Director of Human Resources and Operations at Modus, a global tech company with locations in New York, Buenos Aires, and Manila, where she led a team that created the company's Human Resources functions.

11.     Based on this exceptional experience with her prior employer, Plaintiff was hired as Defendant's Human Resources and Operations Manager on June 1, 2015. Defendant is a Spain-based company that was expanding into the United States market. Accordingly, Plaintiff was hired to build and develop Defendant's United States and Spain Human Resources Departments.

12.     Plaintiff focused on the relations between the executive staff, management and employees, employee orientation, and improving the employees' experience. She also worked in partnership with the executive team and managers on matters such as conflict resolution, coaching, growth, and development. Plaintiff was also responsible for the recruiting, hiring and firing of employees, implementing diversity, and ensuring an EEO compliant work environment free of discrimination.

13.     Plaintiff accepted the job with great excitement and enthusiasm, because it would allow her to build and head the Human Resources and Operations team for a company that she believed would be expanding rapidly. Knowing that Defendant had not yet secured its Series B funding, she accepted the salary of $90,000, with the expectation that her pay rate would grow with company when it expanded.

14.     Upon information and belief, it is customary practice in the tech field for high-level employees to start at a company with a lower salary, with the expectation that once the start-up receives Series B funding, their salary will be increased.

15.     Plaintiff reported directly to the Chief Executive Officer Javier de la Torre (hereinafter "CEO de la Torre") and the Chief Operating Officer Miguel Arias (hereinafter "COO Arias").

### Plaintiff Does Exceptional Work at Defendant, Going Above and Beyond her Duties

16.     As Defendant was new to and unfamiliar with New York, Plaintiff began diligently working to find a new office space, including traveling throughout Brooklyn to select a site, and coordinating its design and construction. Once the company moved into this space, Plaintiff finalized the office's every need, working nights and weekends so that she would not interfere with other employees' work.

3

17. Excited and motivated to do exceptional work on the Human Resources end, Plaintiff stayed at the office late at night in order to draft the policies and procedures that would be necessary for the business to get off the ground and be EEO compliant.

### Plaintiff Implements and Oversees EEO Compliant Discrimination Policies

18. Plaintiff immediately began drafting an Employee Handbook, which laid out, among other things, the Code of Conduct, Sexual Harassment Policies, Leave Policies, and Acceptable Workplace Behavior Policies. As she was required to do, Plaintiff reviewed these policies with and obtained the approval of CEO de la Torre and COO Arias for each policy.

19. For three months from September 2015 to December 2015, Plaintiff worked 10-14 hour days, including weekends and holidays, in an effort to get Defendant's United States location running properly. She became utterly exhausted by her efforts.

20. Plaintiff spoke to COO Arias about the exhaustion she was suffering as a result of her long hours and lack of time off, but her pleas fell on deaf ears. Ignoring her concerns and exhaustion, and refusing to help her, COO Arias instead gave Plaintiff more responsibility by demanding that she somehow "boost the morale" of the office as a whole. Plaintiff, ever the dutiful employee, attempted to do so.

21. After November 2015, she began reporting directly to Vanessa Hamer Director of Business Operations (hereinafter "Director Hamer").

### Defendant Receives a Windfall of $23 Million in Series B Funding, but Refuses to Raise Plaintiff's Salary

22. Plaintiff was excited when Defendant announced in September 2015 that it had raised $23 million in Series B funding, bringing their total funding from $8 million to $31 million.

23. In December 2015, Plaintiff received an excellent performance review reflecting all of the challenging work she had done for the company. She received a bonus of just 2.5% of her salary for her exceptional work. Plaintiff knew from her budgeting of the bonuses that this was

at the low end of bonuses at the company (which were normally around 5% of an employee's salary), and she also knew that hers was especially low because her salary itself was so low.

24.     Also, in December 2015, buoyed by her positive performance review, the Series B funding, and her level of commitment and service to the Company, as well as her dismally low salary, Plaintiff asked Director Hamer for a raise in her salary.

25.     Plaintiff was surprised to hear Director Hamer say that she would not receive a salary increase because she had only been working for the company for six months. Plaintiff knew, from reviewing the budget as Human Resources Manager, that other employees received salary increases at mid-year. However, she hoped that when her mid-year review occurred, after she had been there a year, she would receive a raise to be paid at an appropriate salary.

### Plaintiff is Shocked That Her Male Direct Report Makes $15,000 More Than She Does

26.     In January 2016, upon Plaintiff's suggestion, Director Hamer hired Jeret Jenkins (hereinafter "Mr. Jenkins") as a Recruiter for United States employees. Because Plaintiff managed "recruitment," this new Recruiter was in a lower-level position to Plaintiff and reported directly reported to her.

27.     Plaintiff, who had access to all salaries at Defendant due to her budgeting work, saw that shockingly, Mr. Jenkins, who was male, and who was her direct report, was making $15,000 more than she was.

28.     Upon information and belief, like many companies in the tech industry,[1] Defendant pays women significantly less than their male counterparts across the board.

---

[1] Pay disparity is rampant in the tech industry; in fact, women receive lower salary offers than men for the same job at the same company 63% of the time. Sage Lazzaro, The Observer, 12 Statics About Women in Tech That Show How Big the Gender Gap Truly Is, June 5, 2017; Sheelah Kolhatkat, The New Yorker, The Tech Industry's Gender Discrimination Program, November 20, 2017.

**Defendant Refuses to Fire an Extremely Poor Performing Male Employee,**
**Until Plaintiff Discovers He is Secretly Working Two Jobs**

29.     In May 2016, Defendant hired a male employee to be an Account Executive in the Sales Department. Plaintiff immediately knew that he was not performing to Defendant's standards. He was late to his orientation, unapologetic about it, and refused to pay attention during his orientation.

30.     Knowing that she was responsible for ensuring that employees complied with the Acceptable Workplace Behavior Policy in the Employee Handbook at Defendant, Plaintiff told COO Arias of her concerns, but COO Arias ignored them.

31.     The employee's behavior soon worsened. He immediately began taking excessive vacation days and worked partial days when he was in the office. Other employees in the office continuously looked for him, and asked Plaintiff if she knew where he was. In addition, he showed no enthusiasm for the job, and was condescending to his supervisor and his peers.

32.     Plaintiff again approached COO Arias and asked him to investigate.  COO Arias became furious with Plaintiff, and angrily yelled that she had over-stepped her bounds and that it was not her place to inform him of these issues.  He then walked away. Of course, Plaintiff was hired to handle personnel issues, so COO Arias comments did not make sense.

33.     Still concerned about the impact that the employee's poor performance would have on other Defendant employees, Plaintiff reported the personnel issue to the Vice President of Sales, Ben Mathew (hereinafter "VP Mathew"), the new employee's supervisor, and showed him records of the employee's sporadic attendance at the orientation, excessive absences, and half-days. He, too, failed to act.

34.     Finally, when Plaintiff became suspicious of his continuous "vacation" days and "half-days," she checked with the employee's LinkedIn profile to find out his previous employer and called them. She discovered that he was in fact secretly continuing to work at his former

6

employer and at Defendant at the same time. When she approached VP Mathew with evidence of this, he finally terminated the employee.

35.     Plaintiff was frustrated that both COO Arias and VP Mathew had not taken her earlier concerns seriously and had minimized her authority as the Human Resources Director but hoped that this was a one-time incident and that she would not be disrespected for doing her job in the future.

## Plaintiff Again Asks for a Salary Increase, and is Again Rebuffed

36.     In June 2016, Plaintiff again received an excellent performance evaluation reflecting her challenging work for the company. Knowing that she had performed exceptional work, and keeping in mind, again, that Defendant had received an influx in cash due to their Series B funding, Plaintiff asked Director Hamer for a salary raise. She also advised Director Hamer that she was upset that Mr. Jenkins, her direct report, made $15,000 more than she did.

37.     Director Hamer immediately dismissed her request, patronizingly saying that Defendant never gave mid-year salary increases, and that they would discuss this in December, at the end of the year.

38.     Plaintiff knew, however, from her review of salaries as Human Resources Director, that other employees did in fact receive salary raises outside the end-of-the year time frame, including in mid-year.

39.     Plaintiff pointed out this disparity to Director Hamer, who impatiently told her that regardless of this fact, Plaintiff must wait until the end of the year for her bonus.

40.     Frustrated with her conversation with Director Hamer, she began to despair at ever receiving a salary raise from Defendant. Nevertheless, she continued with her challenging work for Defendant, hoping that the salary increase would come in 2017.

## COO is Angry When Plaintiff Insists an Employee is Entitled to Maternity Leave,

41.     In the summer of 2016, a female employee informed Plaintiff that she was pregnant and, as per the Employee Handbook, was entitled to twelve weeks of paid parental leave.

42.     When Plaintiff informed COO Arias of the employee's impending maternity leave, he became furious.

43.     He yelled at Plaintiff that twelve weeks of parental leave was far too generous, to which Plaintiff calmly reminded COO Arias that he had in fact specifically approved this parental leave policy with her when she created the Employee Handbook.

44.     Furious, COO Arias told Plaintiff that she would have to tell the employee that she was only entitled to six weeks of paid leave. Surprised, Plaintiff reminded the COO that they could not renege on an already-established policy, as this would open Defendant up to a lawsuit by the employee and also send a bad message to other employees.

45.     COO Arias reluctantly conceded the point but clearly blamed Plaintiff for the fact that an employee was able to take maternity leave and ordered her to change the Employee Handbook to provide six weeks of parental leave from that day forward. Plaintiff calmly explained that taking away a benefit the company had already promised employees could open them up to additional challenges including lower morale.

46.     Plaintiff also told COO Arias that changing the policy for all employees hired after this date would reflect very poorly on management.

47.     COO Arias continued to insist that the leave amount should be fewer weeks, but CEO de la Torre ultimately approved the primary leave. Realizing that he was "stuck" with the employee benefit, COO Arias conceded that the policy could not be changed, but clearly blamed Plaintiff for "giving too much" to female employees.

### Defendant Rents a Two-Bedroom Apartment for Employees

48.    In addition to their office in New York, Defendant created a satellite office in Washington DC, and employees traveled between offices for orientations and meetings. Defendant rented a two-bedroom, two-bathroom apartment in Brooklyn, New York to accommodate employees who came from DC on overnight work visits to New York.

### Plaintiff Suffers Sexual Harassment at the Hands of Another Employee

49.    On October 26, 2016, Plaintiff was forced to evacuate her apartment because of a dangerous gas leak, and Director Hamer gave her permission to stay in the company's Brooklyn apartment. When she arrived, she saw one of the Washington DC office's employees, Brett McKinnon, (hereinafter "Mr. McKinnon"), who had been in her orientation trainings in New York during that week. Mr. McKinnon was sleeping on the living room couch and Plaintiff went to the bedroom she was staying in and closed the door.

50.    The next night Plaintiff returned to the apartment at approximately 10:00 pm. She let herself in using the key, and was greeted by Mr. McKinnon scolding her as if it was his apartment, yelling "YOU DON'T KNOCK?" Plaintiff reminded Mr. McKinnon that she also had a key to the apartment and he knew that she was staying there that night.

51.    Mr. McKinnon quickly said with a side smile "I'm just kidding. Welcome home Honey," after which he embraced her by putting his hands around her body and squeezing her. She could smell alcohol on his breath and could tell that he was drunk. Although she was extremely uncomfortable with his unwanted touching, she looked for a way to end the conversation and get to her bedroom without being rude. She nervously exchanged chatter with him to try and placate the situation.

52.    He quickly turned the conversation sexual, coming closer to her while saying "I'm really glad I got to know you … I really think you're cool," and then asking "So, do you have a boyfriend?" Plaintiff told him very clearly that this was not appropriate given their professional

9

relationship, and he scoffed, insisting that he was "just making conversation." Plaintiff told him that she was leaving the room and went into her bedroom and locked the door behind her, scared that he might try to enter her room that night.

53.     While in her bedroom, Plaintiff could overhear Mr. McKinnon speaking in the living room. Upon information and belief, he was on the phone or pretending to be on the phone with a romantic interest, and he was speaking very loudly with the apparent intention of forcing Plaintiff to listen to the phone call, which was sexual in nature. Soon he began talking about having an "erection." Utterly disgusted, Plaintiff found her earplugs and put them in her ears in order to avoid hearing anything further.

### Defendant Fails to Respond Appropriately to Plaintiff's Complaints About the Sexual Harassment

54.     Plaintiff awoke very early the next morning, October 28, 2016, to avoid running into Mr. McKinnon in the apartment, and went immediately to the office so that she did not have to see him in the apartment. Plaintiff was intent on reporting the behavior as a victim and also as the Human Resources Manager to protect Defendant.

55.     Plaintiff was thankful that she, a strong, well informed Human Resources manager had experienced the harassment instead of a less informed employee, because she felt that she was able to quickly get out of the situation and also that she would be able to make sure that Mr. McKinnon did not sexually harass anyone else at Defendant.

56.     Of course, as the Human Resources manager, she immediately went to report what had occurred to Director Hamer. Plaintiff noted to Director Hamer that Mr. McKinnon's behavior violated Defendant's Code of Conduct and Sexual Harassment policies in the Employee Handbook, and that this behavior was reasonable grounds for termination.

57.     When Director Hamer seemed, to Plaintiff's surprise, less than concerned, she stated that, at the very least, Mr. McKinnon should not attend the company-wide summit in Spain

that November 2016, given that it would put Defendant at legal risk should anything else happen to any female employee. Plaintiff was afraid that because all of Defendant's employees were staying in the same hotel and attending the same workshops and company events that Mr. McKinnon might try to sexually harass another female employee.

58.    Director Hamer agreed that Mr. McKinnon had acted inappropriately, and suggested that they inform Mr. McKinnon's supervisor, VP Mathew to see what his thoughts were. VP Mathew was extremely dismissive of Plaintiff's concerns, and clearly felt that she was "overreacting."

59.    He dismissed Plaintiff by saying that Mr. McKinnon "had a lot going on in his life" owing to a divorce, and the passing of a parent, and that he would speak to him. Plaintiff was incredulous that VP Mathew was protecting Mr. McKinnon instead of Defendant and Defendant's employees and also dismissing Plaintiff's own feelings of being violated. She was upset that he was not taking the incident, which she had experienced firsthand, seriously, and told him so. VP Mathew again dismissed her concerns and said that he would handle the situation by "talking to" Mr. McKinnon.

60.    Upon information and belief, Director Hamer started an investigation into the matter because she believed that VP Mathews response was insufficient. Director Hamer met with COO Arias, CEO de la Torre, and outside counsel to discuss the incident. In the end, Plaintiff was devastated to learn that the entire incident was "resolved" by COO Arias giving a supposedly "stern warning" to Mr. McKinnon. He was not even asked to apologize to her or forbidden from using the Brooklyn apartment or going on the Company retreat.

61.    Plaintiff knew that women in tech report an abject failure of male-dominated tech companies to respond to their sexual harassment complaints, and that Defendant was one of these companies who allowed sexual harassment to happen with impunity.

62.     Mr. McKinnon was assigned to work in Defendant's Washington DC office, and so Plaintiff was relieved that she would have to interact with him only when they visited each other's offices for business reasons.

### Plaintiff is Forced to Travel Internationally with her Harasser

63.     Not only was Mr. McKinnon just given a "stern warning," but Defendant allowed him to travel to Spain for the company retreat in November 2016, overruling Plaintiff's objections that this may put Defendant at legal risk.

64.     Having Mr. McKinnon at the company retreat in Spain made Plaintiff immensely uncomfortable, and she warily steered clear of Mr. McKinnon during company meetings.

### Mr. McKinnon Sexually Harasses Additional Employees

65.     Just as Plaintiff had feared, during the company retreat several employees came to Plaintiff and reported that Mr. McKinnon was acting sexually inappropriately with other female employees.

66.     Additionally, it was reported to Plaintiff that Mr. McKinnon had used slurs against gays and lesbians to describe other employees at the retreat, and that employees were uncomfortable and offended.

67.     Plaintiff reported this behavior to Director Hamer, and she failed to reprimand Mr. McKinnon, saying to Plaintiff that no further action against Mr. McKinnon was needed. Plaintiff realized that the management at Defendant did not take the Sexual Misconduct Policy and Non-Discrimination Clause in the Employee Handbook seriously and despaired that other female and gay or lesbian employees may be harassed by Mr. McKinnon.

### Plaintiff Is Shunted Aside by the CEO and COO

68.     Plaintiff noticed that CEO de la Torre and COO Arias were marginalizing her and stunting her career following her reports of sexual harassment.

69.     In late January 2017, Defendant announced to Plaintiff that they would hire a Human Resources and Operations Manager for the Spain office.

70.     CEO de la Torre and COO Arias immediately forwarded her the name of a candidate that they wished to hire, Justyna Adamcyzk (hereinafter "Ms. Adamcyzk"). After her hire, Plaintiff reviewed Ms. Adamcyzk's resume and met her over video chat. She quickly realized that Ms. Adamcyzk was not qualified for the Human Resources position because although she had recruiting experience, she had no experience with Human Resources management and development. She then realized that COO Arias had not interviewed any other applicants but had personally picked Ms. Adamcyzk because he knew her from one of his prior companies.

71.     Given that Plaintiff was hired as a "global" Human Resources and Operations Manager for the entire company, the Spain office was a part of her previous responsibilities, and Ms. Adamcyzk would take away some of Plaintiff's responsibilities. Plaintiff was very upset when Defendant informed her that the new hire would not report to her.

72.     Concerned for her career growth within Defendant, Plaintiff contacted COO Arias, and outlined a more logical arrangement in which she would be made "Director" of Human Resources and Operations (as opposed to "Manager"), and Ms. Adamcyzk (as "Manager") would report to her.

73.     Paying lip service to Plaintiff's idea, COO Arias told her that he would consider it, but in the end failed to promote her as Director or change the fact that Ms. Adamcyzk did not report to her.

74.     Ever the dutiful employee, Plaintiff fully trained Ms. Adamcyzk, even traveling to Spain for one week to train her. Committed to working cooperatively, she and Ms. Adamcyzk worked amiably together from the beginning, and supported each other throughout.

## Again, Plaintiff's Salary was Lower Than Her Direct Report

75.     In March 2017, Plaintiff interviewed and selected a new job recruiter for the Brooklyn office, to replace Mr. Jenkins, and COO Arias ordered her to report to Ms. Adamcyzk. Plaintiff asked for a meeting with COO Arias, expressing her concerns that this new hire was a replacement for her direct hire, and that she should report to her because Plaintiff's job description included recruitment.

76.     For once, COO Arias changed his position and ordered that the new hire report to Plaintiff, but only after Plaintiff at long last felt comfortable to stand up for herself.  However, she was frustrated that previously she had asked COO Arias to further her career and he had rebuffed her request.

77.     Yet again, Plaintiff was shocked to look at her Human Resources budget and see that this direct report accepted an offer at $5,000 more than Plaintiff was making, but less than the male who had previously filled the role. Plaintiff again asked for a raise in her salary to match her seniority at Defendant. COO Arias again dismissed her request, stating that she must wait until the end of the year to request a salary increase.

78.     Plaintiff was again frustrated, because she knew that other (male) employees received salary increases throughout the year.

## Plaintiff is Forced to Be in Close Quarters with her Sexual Harasser

79.     One of Plaintiff's tasks as Human Resources Manager was to train new employees, and in May 2017, three new employees started at the Washington D.C. satellite office. Plaintiff dutifully travelled to the satellite office and trained these three employees, despite knowing that she would have to have significant contact with her sexual harasser, Brett McKinnon, who still worked for Defendant despite the sexual harassment with no repercussions at all.   This arrangement made Plaintiff extremely uncomfortable, especially given this was a small office of approximately 4-5 people, and Mr. McKinnon had only (allegedly) received a "stern warning" for

his behavior. Nonetheless, Plaintiff was a professional, and no matter how uncomfortable she was, she continued her training of the new employees without complaining.

### Plaintiff Objects to Management When an Older Male Supervisor Humiliates a Young Female Employee

80.     In August 2017, Brittany Micek, (hereinafter "Ms. Micek") a young female employee in the Content Marketing Department, came to Plaintiff in tears at the way she had been treated by her older, male direct manager, Devon Hopkins, (hereinafter "Director Hopkins") the Director of Content Marketing.

81.     Director Hopkins had told Ms. Micek that after three years at the company, he did not feel she was growing and did not see a career path for her at Defendant and asked her to write a job description of her dream job, so that they could work on building those skills at Defendant.

82.     Ms. Micek dutifully wrote the job description and then, upon presenting it to Director Hopkins, he patronizingly turned the table on her, stating that her job description was not possible at Defendant, and that she should find another job.

83.     Ms. Micek came to Plaintiff devastated because she felt she had been set up for termination by Director Hopkins, even though she had worked diligently for Defendant for three years. Concerned about the Director's mistreatment of Ms. Micek, Plaintiff promised she would speak to Director Hopkins about the incident.

84.     Upon speaking to Director Hopkins, he confirmed Ms. Micek's story, but said that Ms. Micek was not performing well and that he knew before the exercise that he would eventually terminate her.

85.     On separate occasions, CEO de la Torre and COO Arias agreed with Director Hopkins' handling of the termination and told Plaintiff that she had "messed up" the termination by "consoling" Ms. Micek.

86.     Plaintiff urged Director Hopkins to revisit the issue with Ms. Micek and find ways to increase her positive performance, but Ms. Micek tearily told Plaintiff that she was resigning from Defendant because she felt utterly unsupported by her male supervisor, and she was being set-up for failure.

87.     Owing to her experience with the ineffective male employee who was given wide license to misbehave before he was finally terminated for keeping two jobs, Plaintiff was starting to feel as if the environment at Defendant was a "boys club," in which male employees were given license to misbehave without recourse, and female employees were belittled and treated like little girls.

### The CEO and COO are Furious When Plaintiff Points out that Their Hiring Practices Violated Federal and State Labor Law

88.     Also, in August 2017, VP Mathews notified Plaintiff that he would be extending an offer to Leo Mackey (hereinafter "Mr. Mackey") for a position as Sales Development Representative. VP Mathews informed Plaintiff that Defendant's budget did not allow for his hire until January 2018, and so he would offer Mr. Mackey a paid "internship" for three months, with no health benefits, and then extend a full-time offer to him in the new year.

89.     As was her job, Plaintiff blatantly rejected this proposed arrangement, and respectfully told VP Mathews that it was against federal law to get "free labor" from an employee for a job for which they should have been paid.

90.     Plaintiff knew that there were very specific guidelines under which companies were permitted to hire interns, and that the federal Department of Labor had recently investigated these types of claims in the tech industry, and fined other companies.

91.     After a heated discussion with VP Mathews, he finally accepted the fact that the company could not refuse to pay employees and told her that Mr. Mackey would instead start as a

"contractor," with a small stipend for three months, and be given a full-time position in January 2018.

92.     Much to VP Mathews dismay and anger, Plaintiff still objected, knowing that this contractor position was simply a façade, but VP Mathews angrily told her that this was not going to be changed no matter what because they simply did not have the budget to pay him.

## Defendant Retaliates Against Plaintiff by Marginalizing Her

93.     In September 2017, Plaintiff was shocked and humiliated to learn that Ashley Simcox had been promoted to Director of Operations and Plaintiff would now have to report to her. Ms. Simcox did not have the experience for the job, and adding insult to injury, Plaintiff was tasked with the job of training her for the position, which included several of Plaintiff's job duties. Plaintiff again wondered why she had not been promoted to "Director" of Human Resources and was afraid that she was being sidelined at Defendant.

94.     Further offending Plaintiff was the fact that Ms. Simcox would also make $20,000 more than Plaintiff in her new role.

95.     Plaintiff immediately requested a meeting with COO Arias, in which she pointed out that unlike her, the new Director had no experience in Operations, whereas she had more than seven years of experience. Plaintiff pointed out how ridiculous it was that he would hire a person who had to be trained by a person you were not promoting. Plaintiff pointed out what COO Arias already knew- that her career at Defendant was being stymied because she was not given a Director role. She also outlined several ways in which a new structure could be implemented which would still allow for her growth.

96.     COO Arias testily told Plaintiff that his decision was final, and that she must train the new Operations Manager anyway. He told Plaintiff that she had to have a better "attitude" at work, and worry less about her own salary and position, and more about working "cooperatively" with others.

17

97. Plaintiff was surprised by COO Arias' angry comments, given she had done nothing but exceptional work at Defendant, and had a great relationship with her peers and direct reports, but she realized that he resented her - and was retaliating her for doing her job and objecting to illegal behavior including discrimination.

98. Nonetheless, ever the dutiful employee, Plaintiff spent many hours training Ms. Simcox to essentially do Plaintiff's job.

### Plaintiff Complains of Gender Pay Disparity

99. In preparing for the end of the year salary increases in December 2017, Plaintiff noticed that a female Data Scientist in the Research Department made $65,000, while the rest of her male team members made $100,000. Shocked at this gender disparity, she sent a spreadsheet to COO Arias and CEO de la Torre detailing this fact.

100. Plaintiff was also frustrated that she yet again had to remind them that she also continued to make less than her direct report.

101. Upon information and belief, this pay disparity based on gender was widespread across the departments, and Defendants did nothing to ameliorate the pay gap.

### Plaintiff is Constructively Fired

102. Her fears at being terminated were realized in December 2017, when CEO de la Torre promoted Ms. Adamcyzk to be Director of Human Resources, and informed Plaintiff that she would be reporting to her. Upon information and belief, Defendant promoted Ms. Adamcyzk because they believed that she would do as she was told and not report and object to unethical and illegal behavior.

103. Specifically, upon information and belief, Defendant believed that because Ms. Adamcyzk was a Spanish citizen, she did not have a knowledge of federal and New York labor laws or benefits policies and would not "challenge" the Management at Defendant.

18

104.    CEO de la Torre told Plaintiff that he would be happy to help her find a new job by providing a positive reference, since she probably would not want to stay after being passed over for the promotion.

105.    Around the time of her constructive termination from Defendant, in December 2017 and January 2018, CEO de la Torre gave Plaintiff a list of employees whom he would be terminating that month. Among those who would be terminated was an employee who was on parental leave, the termination of whom would open Defendant up to legal action by the employee.

106.    In addition, Plaintiff was not surprised to find that all of the employees set to be terminated failed to conform to the young, white, male, straight, able-bodied "boys club" at Defendant – including a female in her 40s with disabilities; two gay males; a male in his 50s; and a lesbian.

107.    The proposed list of employees to be terminated did not make business sense, and still focused on doing her job correctly, Plaintiff pointed out that fact to Defendant, but the employees were nonetheless terminated.

108.    Devastated that she was continuously asked to execute policies that she did not agree with on ethical, professional, and legal bases, and completely iced out of any and all decision-making authority and marginalized, Plaintiff was forced out of Defendant on January 19, 2018.

## CLAIMS

## AS AND FOR THE FIRST CAUSE OF ACTION
### (Discrimination)

109.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

110.    Defendant has discriminated against Plaintiff in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.,* as amended by the Civil Rights Act of 1991 ("Title VII"),

Section 296, subdivision 1(a) of the New York Executive Law, and Section 8-107, subdivision 1(a) of the New York City Administrative Code, by subjecting her to different treatment on the basis of her gender. Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendant's wrongful conduct.

111.    Defendant has discriminated against Plaintiff by treating her differently from and less preferably than similarly-situated male employees and by subjecting her to discriminatory pay, discriminatory denial of promotions, discriminatory performance evaluations, disparate terms and conditions of employment, and other forms of discrimination on the basis of her sex in violation of Title VII, the New York Executive Law, and the New York City Administrative Code.

112.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

113.    By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of Title VII, the New York Executive Law, and the New York City Administrative Code, and including an award of punitive damages. In addition, attorneys' fees should be awarded.

## AS AND FOR THE SECOND CAUSE OF ACTION
### (Retaliation)

114.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

115.    Plaintiff voiced concerns to Defendant about Defendant's discriminatory treatment of her.

116.    In retaliation, Defendant subjected Plaintiff to a series of adverse employment actions including, but not limited to, subjecting Plaintiff to a hostile work environment, disparate treatment, a suspension, and a termination of Plaintiff's employment.

117.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless

and conducted in callous disregard of the rights of Plaintiff, entitling her to punitive damages.

118.     As a result of Defendant's conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other monetary loss, and non-economic damages.

119.     By reason of Defendant's retaliation, Plaintiff is entitled to all remedies available for violations of Title VII, the New York Executive Law, and the New York City Administrative Code, and including an award of punitive damages. In addition, attorneys' fees should be awarded.

### AS AND FOR THE THIRD CAUSE OF ACTION
### (Retaliation under NYLL § 215)

120.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

121.     Plaintiff voiced concerns to Defendant about Defendant's violations of the New York Labor Law while employed by Defendant.

122.     In retaliation, Defendant subjected Plaintiff to a series of adverse employment actions including, but not limited to, subjecting Plaintiff to a hostile work environment, disparate treatment, and a constructive termination of Plaintiff's employment.

123.     Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff.

124.     As a result of Defendant's conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other monetary loss, and non-economic damages.

125.     By reason of Defendant's retaliation, Plaintiff is entitled to all remedies available under the New York Labor Law, including reinstatement. In addition, attorneys' fees should be awarded.

## **PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, it is specifically requested that this Court grant Plaintiff judgment as follows:

(i)    On the First Cause of Action, awarding Plaintiff compensatory and other damages including punitive damages in an amount to be determined at trial but in any case, no less than $1,000,000;

(ii)   On the Second Cause of Action, awarding Plaintiff compensatory damages and other damages including punitive damages in an amount to be determined at trial but in any case, no less than $1,000,000;

(iii)   On the Third Cause of Action, awarding Plaintiff compensatory damages and other damages including liquidated damages and reinstatement; and

(iii)   Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, together with such other and further relief as this court deems equitable, proper, and just.

Dated: New York, New York
　　　　December 11, 2018

Respectfully submitted,

GODDARD LAW PLLC
*Attorney for Plaintiff*

By:__/s/ *Megan S. Goddard*_
Megan S. Goddard, Esq.
39 Broadway, Suite 1540
New York, NY 10006
Ofc: 646-504-8363
Fax: 212-473-8705
Megan@goddardlawnyc.com